## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TWIN CITIES PIPE TRADES WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>vs.<br><br>MYLAN, INC., TARO PHARMACEUTICAL INDUSTRIES LTD., TARO PHARMACEUTICALS USA, INC. and SANDOZ, INC.,<br><br>                  Defendants | Civil Action No. _____<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ANTITRUST ACT<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

Plaintiff Twin Cities Pipe Trades Welfare Fund ("Plaintiff" or "Fund"), individually and on behalf of a class of all those similarly situated, through its undersigned counsel, brings this action for treble damages and injunctive relief against Taro Pharmaceutical Industries Ltd. ("Taro Ltd."), Taro Pharmaceuticals USA, Inc. ("Taro Inc.") (collectively, "Taro"), Mylan, Inc. ("Mylan"), and Sandoz, Inc. ("Sandoz") (collectively, "Defendants") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and the laws of the state of Minnesota identified herein. Based on counsel's investigation, research, and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows.

## NATURE OF THE ACTION

1.    Generic drugs are a key component of the nation's healthcare system, accounting for nearly 80% of all prescriptions written in the United States and more than $74 billion in annual sales.[1] Entry of generics into the market is designed to increase competition and decrease prices for the benefit of consumers and their overall health—a matter made even more significant by the need for adequate and affordable healthcare. Generic drugs are generally priced at 30% to 80% less than branded drugs and are pivotal in reducing prescription costs for patients, employers, and healthcare providers.  In recent years, however, the prices of certain commonly prescribed generic drugs have skyrocketed. Normal market forces cannot explain these dizzying increases. Instead, manufacturers have abused their oligopolistic position, acquired through a series of acquisitions that reduced the number of market participants, to increase prices for generic pharmaceuticals far beyond what they would be in a competitive market.

2.    Generic clomipramine hydrochloride in its 25 mg, 50 mg, and 75 mg oral capsule form ("Clomipramine") is a tricyclic antidepressant used for the treatment of obsessive compulsive disorder, panic disorder, major depressive disorder, and chronic pain, and is included on the World Health Organization's List of Essential Medicines as one of the most important medications needed in a basic health system.

---

[1] *See* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm167991.htm (last accessed Feb. 1, 2017); http://www.gphaonline.org/media/cms/Timeline_of_Significant_Events_in_U_S_Generic_Industry.pdf.

3.     Clomipramine experienced a dramatic price increase in mid-2013. Beginning in early May 2013 and continuing through early August 2013—aligning with a February 2013 generic pharmaceutical manufacturer meeting in Orlando, Florida, attended by the Defendants, and a June 2013 generic pharmaceutical manufacturer workshop in Bethesda, Maryland, sponsored by Mylan—Defendants collectively and dramatically inflated their generic Clomipramine prices.

4.     In that timeframe, average Clomipramine prices increased nearly 1,037% and have since been maintained at those supracompetitively high prices.[2] Moreover, Defendants' Clomipramine price inflation was done in lockstep, with Defendants coordinating their unprecedented price hikes during a roughly three-month period, as the inflation of their Clomipramine Wholesale Acquisition Cost ("WAC" or "list") prices illustrates:

---

[2] Unless otherwise indicated: (i) sales data is based on the Actual Acquisition Cost, which is the dollar amount that retail brick-and-mortar and mail-order pharmacies pay wholesalers for the given products, (ii) quantity data is based on the number of units in the total prescription dispensed for the associated products, and (iii) pricing data is the calculated per-unit price for the associated products.



5.      Clomipramine was not the only drug to experience such an unexpected price spike. After years of steady pricing, beginning in 2013, prices for many generic drugs rose suddenly and for no apparent reason.   A January 2014 survey of more than 1,000 members of the National Community Pharmacists Association found that 77% of the pharmacists surveyed reported "huge upswings" in generic drug prices, with prices increasing by as much as 600%, 1,000% or more.[3] These sudden and suspicious increases outraged not only the nation's payers and consumers, but also public officials.

6.      In July 2014, the State of Connecticut launched an investigation into anticompetitive generic drug pricing, followed by a Congressional inquiry and a criminal grand-jury investigation by the U.S. Department of Justice ("DOJ") Antitrust Division.

---

[3] *See Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say*, Nat. Cmty. Pharmacists Ass'n (Jan. 8, 2014), http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say (last accessed Feb. 2, 2017).

7.      Investigation quickly led to action. On September 8, 2016, Taro—which, with its co-conspirators here, manufactures and sells Clomipramine—received a grand-jury subpoena from the DOJ.  According to a September 2016 Taro Ltd. filing with the U.S. Securities and Exchange Commission ("SEC"), the DOJ is investigating Taro's generic-drug pricing generally, and specifically seeks documents and other materials relating to "generic pharmaceutical products and pricing" and company "communications with competitors . . . regarding the sale of generic pharmaceutical products."

8.      Defendant Sandoz, which with its co-conspirators here manufactures and sells Clomipramine, also received a DOJ subpoena in March 2016 relating to the industry-wide investigation into generic drug pricing. Taro's and Sandoz's primary Clomipramine competitor is their fellow defendant here, Mylan. Representatives from each company attended the February 2013 generic manufacturer meetings, and Mylan was listed as an official sponsor of the June 2013 generic manufacturer workshop, believed to have also been attended by Taro and Sandoz.

9.      Taro, Sandoz, and Mylan inflated the price of Clomipramine between May and August 2013.  On November 3, 2016, it was announced that the DOJ expected to file charges arising from its investigation by the end of 2016, and on December 14, 2016, the DOJ brought criminal charges in connection with the pricing of certain generic antibiotics and diabetes treatments. The following day, on December 15, 2016, a group of twenty state attorneys general filed suit against Mylan and five other generic-drug makers, alleging the companies conspired to fix prices and constrain competition for certain

antibiotics and diabetes treatments. Further charges by the DOJ or other officials are expected in 2017.

10.    There is no reasonable justification for Defendants' abrupt and uniform shift in pricing conduct. Indeed, as demonstrated more fully below, Defendants engaged in a broad, well-coordinated, and long-running agreement in restraint of trade to artificially raise the price of generic Clomipramine.  Accordingly, Plaintiff Twin Cities Pipe Trades Welfare Fund, individually and on behalf of a class of those similarly situated, seeks injunctive relief, damages, and all other appropriate relief for Defendants' wrongdoing.

## JURISDICTION AND VENUE

11.    Plaintiff's claim for injuries sustained by reason of Defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees.

12.    This action is also instituted for damages and equitable relief under the antitrust and consumer-protection statutes of, and common laws of, the state of Minnesota, as described below.

13.    This Court has original federal-question jurisdiction over the Sherman Act claims asserted in this Court, under 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

14.    Venue is proper in this judicial district under §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the

Class Period—June 3, 2014 through the present—one or more of the Defendants resided, transacted business, performed actions, was found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

15.    Venue is also proper because each of the Defendants operates and transacts business within the District, each of the Defendants has substantial contacts with this District, and each of the Defendants engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing, located, or doing business in this District.

## THE PARTIES

**Plaintiff**

16.    Plaintiff Twin Cities Pipe Trades Welfare Fund is an employee health and welfare benefit plan with its principal place of business in White Bear Lake, Minnesota. Plaintiff indirectly purchased, paid for, and/or provided reimbursement for generic Clomipramine products, other than for resale, at supracompetitive prices in the United States during the Class Period and was thereby injured.

**Defendants**

17.    Defendant Mylan, a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania, develops, produces, and markets generic pharmaceuticals, including Clomipramine, throughout the United States.  Mylan owns

and operates production and office facilities in Caguas, Puerto Rico, and Morgantown, West Virginia.

18.    Defendant Taro Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel.    Taro Ltd. develops, manufactures, and markets prescription drugs, including generic Clomipramine, throughout the United States.  Taro Ltd. describes itself as a multinational, science-based pharmaceutical company that develops, manufactures, and markets prescription and over-the-counter pharmaceutical products mainly in the United States, Canada, and Israel.  The company's claimed focus includes capsules, tablets, and semi-solids formulations in the neuropsychiatric, cardiovascular, and anti-inflammatory therapeutic categories. Taro Ltd. operates in the United States principally through its subsidiary defendant Taro Inc.

19.    Defendant Taro Inc. is a New York corporation with its principal place of business in Hawthorne, New York. Taro Ltd. operates in the United States through its wholly-owned subsidiary Taro Inc., which markets and distributes Taro proprietary and generic products, including the marketing and sale of generic Clomipramine throughout the United States.

20.    Defendant Sandoz is a Colorado corporation with its principal place of business in Princeton, New Jersey. It develops, produces, and markets generic pharmaceuticals, including Clomipramine, throughout the United States.

21.    All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while

engaged in the management, direction, control, or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

22.    Various other persons, firms, corporations, and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements furthering the antitrust violations and conspiracies alleged herein.

23.    At all relevant times, each defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified or authorized the wrongful acts of each of the other Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

24.    Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of Clomipramine transmitted interstate between and among the offices of Defendants and their customers throughout the United States, its territories, and the District of Columbia (the "United States").

25.     Throughout the Class Period, Defendants transported substantial amounts of Clomipramine in a continuous and uninterrupted flow of interstate commerce throughout the United States.

26.     Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

**Generic Drugs in the United States**

27.     Since enactment of the Hatch-Waxman Act in 1984, generic drugs have been a critical aspect of the nation's healthcare system, saving consumers and the healthcare system tens of billions of dollars annually—long considered one of the few bargains in the U.S. healthcare system.  Intended to simplify the regulatory process for bringing generic drugs to the public, the Hatch-Waxman Act eliminated the requirement that generic companies file a complex New Drug Application ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval.  Instead, it allows drug companies to file an Abbreviated New Drug Application ("ANDA") and rely on the safety and efficacy data submitted by the original NDA holder.  Additionally, the Hatch-Waxman Act made other changes related to the time period during which branded drugs would enjoy a period of generic marketing exclusivity.

28.     Generic drugs are exact substitutes for brand-name drugs that have met FDA standards for bioequivalence and pharmaceutical equivalence.  To be approved by the FDA through an ANDA, a generic-drug product must contain the same active

ingredient(s) in the same dosage form and in the same strength, and must be "bioequivalent" to the reference listed drug (i.e., the original brand-name version of the drug approved by FDA through an NDA). Under FDA rules, products that are classified as equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.

29.    As an incentive to provide alternatives to branded drugs, the first generic manufacturer to file a substantially complete and certified ANDA is allowed to market its generic drug free from competing generic manufacturers for a set period. Often, the first generic in the market is introduced at a price well below the branded drug and quickly takes a large market share from the branded drug. As more generics enter the market, the average generic price typically falls to 20% or lower of the branded price. A recent study found that generic medicines saved consumers $193 billion in 2011 alone.  Stephen W. Schondelmeyer (BS Pharm., MA Pub. Adm., Pharm.D., Ph.D., PAPhA, professor and head of the Department of Pharmaceutical Care and Health System, Century Mortar Club Endowed Chair in Pharmaceutical Management and Economics, University of Minnesota) has explained that the prices of generics "continue to fall compared to the brand price, and their combined share of the market for the molecule, relative to the brand name equivalent, usually continues to grow."[4]   Professor Schondelmeyer has also stated:

---

[4] *Why Are Some Generic Drugs Skyrocketing in Price?*: Hearing before the S. Comm. on Health, Education, Labor, and Pensions, 113th Cong. (Nov. 20, 2014) (Statement of Stephen W. Schondelmeyer).

The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

30.    In remarks to Congress in November 2014, Professor Schondelmeyer explained that price trends for generic drugs were rising, and rising at a rate (12.9%) far outstripping the rate of general inflation (1.5%). He further explained that "[t]he average annual retail price increase for brand name prescription drug products in 2013 (12.9 percent) was more than two times higher than the average annual brand name drug price increase in 2006 (5.7 percent)."

31.    The average price of Clomipramine sold by Defendants saw an increase of 1,037% in just three months in 2013. Defendants' Clomipramine WAC prices likewise uniformly rose and continue to be inflated to this day. Defendants' 2013 WAC price increases are illustrated below:



**Defendants' Clomipramine List Prices**

32.    The Actual Acquisition Cost of Clomipramine, which is the dollar amount that retail brick-and-mortar and mail-order pharmacies pay wholesalers, also strikingly demonstrates Defendants' collusion, as illustrated below:



Retail Pharmacies' Clomipramine Purchase Prices

**Generic Drug Manufacture and Distribution**

33.    Unlike brand-drug manufacturers that develop novel drug compounds and then must spend years conducting studies prior to receiving NDA approval from the FDA, generic drug manufacturers do not develop new drugs. Instead, generic drug manufacturers compound drugs in a variety of forms—capsules, creams, inhalants, injectables, liquids, ointments, and tablets—that are identical to an original branded drug

after that drug's patent protection has expired and the generic manufacturer has received FDA approval of its ANDA.

34.     Generic drugs may be manufactured by the same companies that manufacture brand-name drugs, or may come from companies that manufacture generics exclusively. Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce generic drugs for the U.S. market are foreign companies or are owned by foreign companies.  For example, Defendant Taro Inc. is a wholly owned subsidiary of Taro Ltd., based in Israel, and Defendant Sandoz is the generic-drug unit of Swiss pharmaceutical giant Novartis AG.

35.     Generic drug manufacturers also manage the sale of drugs to many different drug wholesalers, distributors, retailers, and group purchasing organizations. Wholesalers and distributors purchase pharmaceuticals from the manufacturers and distribute them to customers such as pharmacies, hospitals, and medical facilities.  Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation.  Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans, and group purchasing organizations. Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members. GPOs can represent retail, governmental, or healthcare groups.  Some of the larger GPOs include Vizient and Premier, Inc.

36.     Because the various generic drugs produced by different drug manufacturers are functionally identical, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers, and GPOs is largely based on each manufacturer's price and ability to supply the drug.  The Defendants in this action are all drug manufacturers or suppliers and, as such, should be competing directly with one another for the sale of Clomipramine to consumers in the United States.

**Clomipramine Hydrochloride**

37.     Clomipramine, which has been available on the generic market since 1996, is a tricyclic antidepressant used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain. Discovered by a Swiss drug manufacturer in 1964, the drug was first approved by the FDA for sale in the United States in 1989 by the company Mallinckrodt Pharmaceuticals under the trade name Anafranil. The drug was approved for sale as a generic in 1996 and is included on the World Health Organization's List of Essential Medicines, indicating that it is among drugs that satisfy the priority healthcare needs of the United States.

38.     The market for generic drugs such as Clomipramine is mature. Hundreds of thousands of prescriptions for this drug are filled each year. Annual sales of the drug for 2015 were $519 million; collective sales for 2011–14 were $1.08 billion.

39.     Defendants dominated the Clomipramine market. In 2013, Mylan's Clomipramine sales exceeded $96.14 million. Taro's Clomipramine sales in the same period exceeded $96.67 million, and Sandoz's 2013 Clomipramine sales exceeded $7.66 million.  Based on these same sales figures, Defendants' Clomipramine sales make up

roughly 97.9% of the clomipramine hydrochloride sales in the United States, as illustrated below:



40.     Before May 2013, the average price of Clomipramine had remained stable and under a dollar per pill at approximately $0.94 per unit since at least as early as January 2011. Then, following Defendants' February 2013 meeting, the average price of Clomipramine rose abruptly to over $10 per pill during a three-month time span:

**Defendants' Price Increases Were Dramatic and Uniform**

41.    As illustrated above, the increase in Defendants' Clomipramine prices was dramatic and uniform. In or around late April 2013, Defendants' manufacturer list prices for Clomipramine (per unit) were:

| Manufacturer | 4/26/2013 |
|---|---|
| Taro | $0.33 |
| Mylan | $0.39 |
| Sandoz | $0.35 |

42.    As the conspiracy unfolded in the few short months following their February 2013 meeting, Defendants uniformly raised their Clomipramine list prices beginning in May 2013, as shown below, and by late July 2013, Defendants' inflation of their Clomipramine list prices was complete and in line:

| Manufacturer | 5/3/2013 | 5/24/2013 | 7/26/2013 |
|---|---|---|---|
| Taro | $8.99 | $8.99 | $8.99 |
| Mylan | $0.40 | $8.99 | $8.99 |
| Sandoz | $0.36 | $0.37 | $8.99 |

43.    Defendants' list-price inflation had a direct impact on Clomipramine's Average Wholesale Price ("AWP")—the price at which pharmaceuticals are purchased at the wholesale level.  Indeed, the magnitude of Defendants' price inflation is indisputable, as illustrated by the following Clomipramine AWP for each Defendant in March, August, and September 2013:

| Manufacturer | 3/29/2013 | 8/30/2013 | 9/30/2013 |
|---|---|---|---|
| Taro | $0.94 | $10.58 | $10.44 |
| Mylan | $0.94 | $10.77 | $10.76 |
| Sandoz | $0.66 | $9.49 | $10.48 |

**No Commercial Justification for Price Increase**

44.     There were no reasonable justifications for this abrupt shift in pricing conduct. One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Clomipramine before, during, or after mid-2013.  The FDA reported no Clomipramine drug shortages, there was no new patent or formulation, no labelling changes, and, once in production, clomipramine hydrochloride is not difficult to make.  Defendants have not provided any meaningful explanation for the coordinated price increases. Indeed, there were no similar price spikes in other countries, including, for example, in the United Kingdom, Denmark, or Norway. Clomipramine prices have remained consistent in those countries.



**Governmental Investigations into Defendants' Activities**

45.    These drastic price increases have resulted in multiple, ongoing government investigations, the results of which are not publicly known at this time.

46.    According to Taro Ltd.'s SEC Form 6-K, filed on September 9, 2016, Taro, as well as two senior officers in its commercial team, received grand-jury subpoenas from the DOJ's Antitrust Division seeking documents relating to "corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

47.    That Taro received subpoenas from a federal grand jury seeking information about its generic prices and its "competitors" is significant, as the DOJ's Antitrust Division Manual ("DOJ Manual") cautions that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  DOJ Manual, at III-82, §F.1 (April 2015).  The staff request "should forward the grand jury request memorandum to the field office chief for review. If approved by the chief, the grand jury request memorandum should be emailed to the [Antitrust Criminal Enforcement Division]."    *Id.*    "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83.  "The investigation should

be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the issuance of federal grand-jury subpoenas to Taro and its employees strongly indicates that antitrust offenses have occurred.

48.    The issue of skyrocketing generic-drug prices is one of national importance.  Besides the DOJ subpoenas, Congress has taken an interest in the issue, holding hearings and calling for an investigation. In October 2014, Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation.

49.    Sanders and Cummings wrote letters to 14 pharmaceutical companies stating that "'[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses.'" The congressmen cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting patients'" and are having a "'very significant'" impact on pharmacists' ability to continue serving patients. That study, for the National Community Pharmacists Association, also found some patients refused to fill needed prescriptions because of rising prices.[5]

50.    "It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications

---

[5] Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last accessed Feb. 2, 2017).

affordable for the millions of Americans who rely on prescriptions to manage their health needs.  We've got to get to the bottom of these enormous price increases," Sanders said.

51.    "When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why," said Cummings.   "I am very pleased that Chairman Sanders has joined me in this bicameral investigation because in some cases these outrageous price hikes are preventing patients from getting the drugs they need."

52.    On December 15, 2016, twenty states filed a lawsuit under seal in a Connecticut federal court against a group of generic-drug makers, including Mylan, alleging "evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." In commentary on the case, an agent with the Federal Bureau of Investigation stated that "[c]onspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law."[6]

**Trade Associations Facilitated Defendants' Scheme**

53.    The generic-drug market is structured in a way that enables generic-drug manufacturers, including Defendants, to frequently interact and communicate with each other directly and in person. The publication Policy and Regulatory Report, citing a prosecutor involved with the government's generic-pricing investigation, said the DOJ is looking closely "at trade associations as part of their investigation as having been one

---

[6] Matthew Perrone, *Federal prosecutors accuse execs of fixing drug prices*, Assoc. Press, Dec. 15, 2016.

potential avenue for facilitating the collusion between salespeople at different generic producers." The investigative subpoena issued to Taro focuses on "communications with competitors . . . regarding the sale of generic pharmaceutical products."

54.    As these regular trade meetings were occurring, the prices for more than a thousand generic pharmaceutical drugs skyrocketed in 2013 and 2014. According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."[7] During this time, Defendants met and interacted frequently at industry trade shows and multi-day conferences, including those hosted by the Generic Pharmaceutical Association ("GPhA"), the National Association of Chain Drug Stores, Healthcare Distribution Alliance, and Efficient Collaborative Retail Marketing, among others.  At these conferences and trade shows, representatives from generic drug manufacturers, including the Defendants, interact and discuss their respective businesses and customers and are provided with ample opportunity to discuss, devise, and implement a range of anticompetitive schemes that unreasonably restrain competition in the generic-drug market.

55.    For example, Defendants regularly met at GPhA meetings in and around the Class Period. From February 20 to 22, 2013, Defendants met in Orlando, Florida for a GPhA conference. Defendants met again on June 4–5, 2013, in Bethesda, Maryland.  As illustrated above, pricing data demonstrates that shortly after these meetings, Defendants dramatically and uniformly inflated the cost of generic Clomipramine.

---

[7] Gillian Mohney, *Generic Drug Price Sticker Shock Prompts Probe by Congress*, ABC News, Nov. 21, 2014, http://abcnews.go.com/Health/generic-drug-prices-skyrocketing-lawmakers-warn/story?id=27060992.

## THE GENERIC CLOMIPRAMINE MARKET
## IS SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

56.    Publicly available data on the generic Clomipramine market in the United States demonstrates its susceptibility to cartelization by the Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) inter-competitor contacts and communication.  Each of those factors is present here.

**Market Concentration**

57.    A high degree of concentration facilitates the operation of a cartel by making it easier to coordinate behavior among co-conspirators. In the U.S., Defendants control the vast majority of the generic Clomipramine market, As discussed above, Defendants' 2013 total annual sales of Clomipramine—roughly $200.49 million— comprised roughly 97.9% of all annual Clomipramine sales, as illustrated below:



58.    Defendants' collective dominance is also compellingly illustrated by comparing the Herfindahl-Hirschman Index ("HHI") for Clomipramine and for benzodiazepine, which is another generic drug that belongs to a different Anatomical Therapeutic Chemical classification code. HHI is a standard measure of firm concentration in a given industry and an indicator of the level of competition in that industry.   An HHI score of 0 indicates perfect competition, while a score of 10,000 indicates a monopoly. The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800, and it considers markets "highly concentrated" when their HHI is above 2,500.[8] As illustrated below, the HHI for Clomipramine on average since the beginning of 2012 shows a highly concentrated market.  The benzodiazepine index was roughly half that of Clomipramine during the same timeframe and that drug's price movements remained relatively stable:



**Barriers to Entry**

59.    Supracompetitive pricing in a market normally attracts additional competitors hoping to take advantage of the high levels of profitability that are available.

---

[8] *See* http://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Feb. 2, 2017).

However, the presence of significant barriers to entry makes this more difficult and helps enable operation of a cartel.

60.    Here, there are significant capital requirements, high manufacturing costs, and regulatory and intellectual property barriers to entry into the generic Clomipramine market. ANDAs alone, which are necessary to bring a new generic drug to market, take an average of 36 months to be approved by the FDA.  This process can take even longer if the FDA requires Tier 1 and 2 amendments.

61.    In addition, Defendants—a very limited number of participants—dominate the Clomipramine market, one also considered too small on a worldwide basis to entice most of the world's major pharmaceutical manufacturers to enter.

**Demand Elasticity**

62.    Elasticity of demand is defined as the relationship between a change in the quantity demanded for a product or service and a change in price for the same product. More simply, it measures the responsiveness of a price change on the quantity demanded. Demand is considered inelastic if an increase in price yields only a small decrease in quantity sold.

63.    Generic Clomipramine is an important and critical drug. Hundreds of thousands of prescriptions are written each year for patients who require it.  Patients consider it a necessity that must be purchased at any price set by Defendants. As such, demand for Clomipramine is inelastic.  Generic Clomipramine is an ideal product to price-fix, because price increases result in significantly more revenue with scant loss in

sales volume.  Defendants were able to significantly increase Clomipramine prices with minimal effect on the quantity demanded.

64.    Clomipramine, for example, has an almost perfectly inelastic demand curve, as illustrated below.  Indeed, a 1,037% increase in the price for Clomipramine results in only a 12% decrease in quantity demanded. For Medical Care and Insurance, however, a price increase of 125% would result in no more quantity demanded. Highly inelastic demand enables Defendants' cartel behavior, as Defendants are able to significantly raise Clomipramine prices with minimal effect on quantity demanded, but a massive upside of hundreds of millions of dollars gained:



| Examples | Ed | Price % Change | Qd % Change | Elasticity |
|---|---|---|---|---|
| Clomipramine | -0.01 | 1037% | -12% | Highly inelastic |
| Medical Care and Insurance | -0.80 | 125% | -100% | Relatively inelastic |
| Public Transportation | -3.50 | 29% | -100% | Highly elastic |

**Lack of Substitutes**

65.    While there are other antidepressant drugs under the same code on the market (Act and/or their Therapeutic Characteristics ("ATC") code N06AA non-selective monoamine reuptake inhibitors), there are significant barriers to change.  Clomipramine is prescribed for a variety of specific health conditions, including obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.    Annually, hundreds of thousands of prescriptions are written for Clomipramine because it is unique in its potency, formulation, and effectiveness.    Users of antidepressants such as Clomipramine are cautioned about potential problems associated with abrupt discontinuation, including antidepressant discontinuation syndrome, a condition that can occur following the interruption, dose reduction, or discontinuation of antidepressant drugs such as Clomipramine.[9]

66.    A small but significant increase in the price of Clomipramine does not prompt users to switch to other drugs. Even a large increase in price, such as occurred here, did not cause most users to switch to another drug. For example, between January 2012 and April 2016, the quantity sold of Clomipramine and desipramine, a tricyclic drug similar in clinical effect to Clomipramine, remained consistent despite Clomipramine's significant and dramatic mid-2013 price increase:

---

[9] *See* Christopher H. Warner, *et al., Antidepressant Discontinuation Syndrome*, Am. Fam. Physician, Aug. 1, 2006, at 449-456.



67.     Further, Clomipramine's price increase did not extend to the other drugs in

its class. From January 2012 through April 2016, the prices of amitriptyline, desipramine,

doxepin, nortriptyline, and imipramine, drugs that have the same ATC coding as

Clomipramine and are similar in clinical effect, remained at consistent prices despite

Defendants' significant and dramatic mid-2013 Clomipramine price hike:



68.     Based on prescriptions filled nationally from January 2012 to mid-2015, Clomipramine remains doctors' and consumers' prescription of choice over these comparable drugs.  Even if there were a shift toward these comparables in prescriptions, Defendants' scheme would be affected by any material change for a number of reasons, including that co-pay tiering changes take significant time (up to two years), consumers have little incentive to change a repeat prescription since price shock is absorbed by insurers and Medicare, and there are explicit barriers forbidding Medicare to negotiate prices.

**High Degree of Interchangeability**

69.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively.  Generic drugs are by definition interchangeable.

70.     The generic Clomipramine made by Defendants is chemically identical. The FDA requires that products be coded "AB" if a study demonstrating bioequivalence is submitted.  The FDA lists clomipramine hydrochloride as an AB-rated generic drug. This confirms that all manufactured versions of clomipramine hydrochloride are therapeutically equivalent to each other and pharmacists are able to substitute one manufacturer's version for another. The following chart based on FDA application records for Clomipramine demonstrates this interchangeability:

| Drug Name | Active Ingredients | Strength | Form | Therapeutic Equivalent Code | Application Number | Company |
|---|---|---|---|---|---|---|
| Anafranil | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | 019906 | Mallinckrodt LLC |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074364 | Sandoz |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074694 | Taro |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074947 | Mylan |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074958 | Teva |

**Absence of Competitive Sellers**

71.    Companies outside the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy more difficult.  With generic Clomipramine, however, there is no realistic threat that a fringe of competitive sellers will capture market share from Defendants. The Defendants have oligopolistic power in the market for generic Clomipramine, enabling them to raise prices without losing market share to non-conspirators. And, following the dramatic price increases, no Defendant is willing to meaningfully undercut prices to gain market share, as would be expected in a competitive marketplace.

**Contacts and Communication Opportunities**

72.    To be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations create relationships between individuals who would otherwise be expected to compete vigorously. Here, the Defendants are members of or participants in multiple industry trade organizations, including the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." [10] Thus, representatives of Defendants have the opportunity to meet and conspire at functions of this organization, as well as at multiple other trade shows, conferences, customer events, dinners, and meetings.  The grand-jury subpoena to Taro Ltd., requesting information about communications between the Defendants, lends further credence to the likelihood that communications between competitors occurred with respect to the pricing of generic Clomipramine.

73.    In addition to their regular meetings at generic pharmaceutical industry events, Defendants have access to and share significant and highly detailed market pricing and quantity information.  This information sharing provides opportunity to share information and facilitates pricing coordination, especially in a market with limited participants. Federal DOJ and U.S. Federal Trade Commission ("FTC") antitrust guidelines acknowledge and are based on this phenomenon in the context of access to competitor information:

---

[10] *See* http://www.gphaonline.org/about/membership (last accessed Feb. 2, 2017).

A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. . . . Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

\*       \*       \*

The Agencies [*i.e.*, DOJ/FTC] regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.[11]

74.     Here, in the highly inelastic generic Clomipramine market, which Defendants dominate, Defendants were actively able to ensure the success of their scheme and police any cheating, because they share and have access to one another's prices, market share, quantities sold, and other material market and sales data.

## DEFENDANTS' ANTITRUST VIOLATIONS

75.     During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of generic Clomipramine in the United States.

76.     In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially raise, fix, maintain, and/or stabilize the price of generic Clomipramine sold in the United States.  These activities included the following:

---

[11] U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* §7.2 (Aug. 19, 2010).

(a)    Defendants participated in meetings and conversations to discuss the price of generic Clomipramine in the United States;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Clomipramine sold in the United States;

(c)    Defendants agreed during those meetings and conversations to fix the prices of generic Clomipramine; and

(d)    Defendants issued price announcements and price quotations in accordance with their agreements.

77.    Defendants and their co-conspirators engaged in these activities for the purpose of carrying out the unlawful agreements described in this complaint.

78.    During and throughout the period of the conspiracy alleged in this complaint, Plaintiff and members of the Class purchased generic Clomipramine at inflated and supracompetitive prices.

79.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1 and 3) and the laws of the state of Minnesota.

80.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the classes defined below have been injured in their business and property, in that they have paid more for generic Clomipramine than they would have paid in a competitive market.

81.    The unlawful contract, combination, or conspiracy has had the following effects, among others:

(a)    Price competition in the market for generic Clomipramine has been artificially restrained;

(b)    Prices for generic Clomipramine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    Purchasers of generic Clomipramine have been deprived of the benefit of free and open competition in the market for generic Clomipramine.

## CLASS-ACTION ALLEGATIONS

82.    Plaintiff brings this action as a class action under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the laws of the state of Minnesota as detailed in Counts II, III, and IV.

83.    The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and 23(b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons and entities in the United States and its territories, as defined herein, who purchased, paid, or provided reimbursement for some or all of the purchase price of Defendants' generic Clomipramine from June 3, 2014 through the present.  This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription-drug plans; (c) all persons or entities who purchased Defendants' generic Clomipramine for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Clomipramine were paid in part by a third-party payor and whose co-payment was the same regardless of the

retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

84.     Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3) seeking damages under the antitrust and consumer-protection statutes of, and the common law of, the state of Minnesota.  This class is the Damages Class and is defined as follows:

> All persons and entities that purchased, paid, or provided reimbursement for some or all of the purchase price of Defendants' generic Clomipramine from June 3, 2014 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased in Minnesota.  This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription-drug plans; (c) all persons or entities who purchased Defendants' generic Clomipramine for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Clomipramine were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

85.     The Nationwide Class and the Damages Class are referred to collectively herein as the "Class."

86.     Due to the nature of the trade or commerce involved, Plaintiff does not know the exact number of Class members involved; however, Plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

87.     Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests

of the Class. Plaintiff and Class members purchased generic Clomipramine at artificially maintained, supracompetitive prices due to the actions of Defendants in connection with the restraint of trade alleged herein. Plaintiff's interests coincide with, and are not antagonistic to, those of the other members of the Class.

88.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class-action litigation.

89.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

90.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants and their co-conspirators colluded to fix, raise, maintain, or stabilize the price of generic Clomipramine in the United States;

(b)    Whether Defendants violated §1 of the Sherman Act;

(c)    Whether Defendants violated §3 of the Sherman Act;

(d)    Whether Defendants violated the laws of the State of Minnesota;

(e)    The duration of the conspiracy alleged in this complaint;

(f)    The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(g)    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

(h)    Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent continued violation of §1 of the Sherman Act.

91.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would create. Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action. Finally, the Class is readily ascertainable.

## COUNT I

### For Violation of §§1 and 3 of the Sherman Act
### on Behalf of Plaintiff and the Nationwide Class

92.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

93.    During the Class Period, Defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, by artificially reducing or eliminating competition

in the market for generic Clomipramine and engaging in a conspiracy to artificially fix, raise, maintain, or stabilize the prices for generic Clomipramine in the United States.

94.     In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of generic Clomipramine in the United States.

95.     In formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially fix, raise, maintain, and stabilize the prices of generic Clomipramine in the United States.

96.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among Defendants.

97.     Defendants' conspiracy had the effect of artificially inflating the price of generic Clomipramine in the United States.

98.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Nationwide Class paid more for generic Clomipramine than they otherwise would have but for Defendants' unlawful conduct.

99.     By reason of Defendants' unlawful conduct, Plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic Clomipramine.

100.     As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

101.    These agreements constitute trade restraints made between direct competitors that are unlawful under all three applicable standards of review: (1) the *per se* standard, which governs bid-rigging and allocation of markets by horizontal agreement; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard ("Rule of Reason"), which governs all other challenged restraints of trade. Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the "quick-look" standard and the Rule of Reason.

102.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes
### on Behalf of Plaintiff and the Damages Class

103.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

104.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy regarding the sale of generic Clomipramine in unreasonable restraint of trade and commerce and in violation of the law of the state of Minnesota as set forth below.

105.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and maintain

artificially supracompetitive prices for generic Clomipramine and to allocate customers for generic Clomipramine in the United States.

106.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts furthering the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Clomipramine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Clomipramine provided in the United States; and (b) participating in meetings and trade-association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

107.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Clomipramine.

108.   As alleged in this Complaint, Defendants and their co-conspirators: entered into an unlawful agreement in restraint of trade; entered into and engaged in a continuing unlawful trust and concert of action in restraint of trade and commerce; and fixed, raised, stabilized, and maintained prices of generic Clomipramine at supracompetitive levels.

109.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Clomipramine has been restrained, suppressed, or eliminated; (2) prices for generic Clomipramine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially

high, noncompetitive levels; and (3) those who purchased generic Clomipramine directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

110.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic Clomipramine than they otherwise would have paid but for Defendants' unlawful conduct.  As a result of Defendants' violations of law, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including reasonable attorneys' fees. Defendants' anticompetitive acts described herein were knowing and willful and constitute flagrant violations of the Minnesota Antitrust Law of 1971, Minn. Stat. §325D.49, et seq.

111.    Plaintiff and members of the Damages Class have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and members of the Damages Class have paid more for generic Clomipramine than they otherwise would have paid but for Defendants' unlawful conduct. The antitrust laws of the state of Minnesota were designed to prevent this type of injury and make Defendants' conduct unlawful.

112.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct occurred at the expense and detriment of Plaintiff and the members of the Damages Class.

113.    Accordingly, Plaintiff and the members of the Damages Class seek damages (including statutory damages, where applicable), to be trebled or otherwise

increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state law.

## COUNT III

### Violation of State Consumer-Protection Statutes
### on Behalf of Plaintiff and the Damages Class

114.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

115.   As described herein, Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which generic Clomipramine was sold, distributed, or obtained, and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded without deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Clomipramine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The

conduct of Defendants described herein constitutes deceptive acts or practices within the meaning of the laws of the State of Minnesota, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in an honest marketplace in which economic activity is conducted in a competitive manner.   Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine.   During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in the United States, and Defendants' illegal conduct substantially affected commerce and consumers in the United States.

116.   During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold or distributed generic Clomipramine in the United States. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under the Minnesota Consumer Fraud Act, Minn. Stat §325F.68, et seq.

## COUNT IV

### Unjust Enrichment
### on Behalf of Plaintiff and the Damages Class

117.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

118.    As a result of their unlawful conduct described above, Defendants have been, and will continue to be, unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, generic Clomipramine.

119.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the benefits resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic Clomipramine manufactured by Defendants during the Class Period.

120.    Plaintiff and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro-rata basis.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court enter judgment on Plaintiff's behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.      Defendants have engaged in a combination and conspiracy in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.      Plaintiff and the members of the Class are entitled to recover damages they sustained, as provided by the state antitrust law described in Count II and the consumer-protection law described in Count III; an injunction under federal antitrust laws; and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury.

DATED: February 15, 2017

Respectfully Submitted,

/s/ *Roberta D. Liebenberg*

Roberta D. Liebenberg
Paul Costa
Adam J. Pessin
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: 215-567-6565
Facsimile:  215-568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

Karen Hanson Riebel, MN#219770
Heidi M. Silton, MN#025759X
Anna M. Horning Nygren, MN#0386514
Kristen G. Marttila, MN#0346007
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile:  612-339-0981
khriebel@locklaw.com
hmsilton@locklaw.com
amhorningnygren@locklaw.com
kgmarttila@locklaw.com

*Attorneys for Plaintiff*